is 25-30201 Medco Energi U.S. LLC v. Cantor. Mr. O'Connor. May it please the Court, good afternoon, Your Honors. I'm Scott O'Connor and I represent the appellant. We're asking the Court to reverse the District Court's summary judgment in this case on two issues. One issue is whether the federal agencies involved here, which are the Bureau of Safety and Environmental Enforcement and the Office of Natural Resource Revenue, lack congressional authority to assess and demand payment of inspection fees for offshore installations in the Gulf. If the Court rules in our favor and reverses on that issue, then appellant would not be required to pay inspection fees as those inspection fees would not have been authorized. The second issue is whether under the applicable regulation defining facility here, the Bureau of Safety and Environmental Enforcement, which I'll refer to as BSEE, correctly interpreted and applied its definition of facility to the installation that issue here when the evidence in the record shows that it adopted a policy and practice for all purposes to treat every installation, whether primary or secondary, that lack of connecting walkway to the primary installation as a separate facility. And the consequence of that was instead of following the schedule of fees that would be due if you treat facilities primary and secondary installations as a single facility, which is what the regulation says, in this instance treating them as one facility would have yielded a $31,500 inspection fee annually for the years in question here, when instead if they treated them as separate facilities for these 19 installations, it yielded an assessment of $323,000. If the court were only to reverse on that issue, our request is that it reduce the assessment from $323,000 to $31,500. By way of background, the installations in question are located on the main path block 64 in shallow waters approximately 8 miles east of Boothville, Venice in south Louisiana, and they were put in place in the early 1980s. They're comprised of two central platforms that contain the processing equipment and similar handling equipment, and those platforms are connected by walkway. There's a satellite or secondary installation, which are the caissons referred to in the brief. There's no dispute as to what these caissons are. They rise above the water, they support a single well, they're tied back to the platform via subsurface flow lines, and in this instance only one of those 19 caissons is connected to the platforms via walkway. The other 18, by all indications, by all evidence in the record, are exactly identical to the one that's connected via walkway, with the exception that they're not connected via walkway, and as the declaration of the government's representative indicates, they're some distance away, and I think the evidence establishes that that some distance varies from about 1,500 feet is the next closest one, and about a mile away is the most distant one. So they counted as one facility, the caisson, that has the walkway? That's correct. So the two platforms that are connected by walkway and one caisson is connected by walkway in one facility. And we're reviewing for clear error this determination of complexity or not? I believe you're reviewing for whether the interpretation is reasonable given the language of the regulation, and I don't think it was prompted for the district court to have given deference to the agency's interpretation in this circumstance, because the agency's interpretation essentially reached out and all together gave the portion of the regulation. And the CELCIEA, is that how you pronounce it, CELCIEA declaration? Yes. Those are the relevant paragraphs, six to nine? Seven or nine, I think. It is six or seven or nine. Yes, I'm referring to that. Is it true factually that they did inspect each caisson? They had to go to each one? There's no evidence in the record that indicates what the inspections actually involved. The only statements I found were in a brief that suggested or indicated that the inspection required getting in a boat to go to the other 18 caissons that weren't connected by walkway. But it doesn't say whether the inspections entailed going to them, getting out of the boat, getting onto the structure that's above the water. There's no indication one way or the other. Nor is there any indication of the time it took to do that or whether it required one inspector or more than one inspector who provided the means of transportation. None of that's in the record, as best I can determine. Am I oversimplifying it to say the regulation, just the plain language, focuses on the complexity of the installation and not the complexity of travel? Is that essentially? My reading is what I would say is a fair reading. Because otherwise, it's hard to reconcile the provision that says, even in the instance that they're not connected by walkway, they should be treated as a single facility. That certainly implies, at a minimum, that they're some distance away and they're not connected by walkway. So I don't see how you can reconcile the two. And then in the Saussure statement, it doesn't indicate that the agency's policy and practice distinguish at all between the distance between the primary installation and the secondary installations. If it wasn't attached via walkway, that... So what's an example of a secondary installation that's attached underwater that you would say shows complexity? What would you say would qualify as a separate installation? Even though sub C, they're all one. I can envision a situation where, if they're not identical, if for some reason these individual installations, even though they don't have potentially the processing equipment because that's on the host or the primary, that maybe they're not identical, maybe they don't have identical well protection, that perhaps that could justify... And here, it's undisputed that every single caisson was identical? In the description in the government's brief, they describe everyone the same way. Very simplistically, they protrude above the water. And we have the photos. There's no evidence that indicates that they're in any way distinct from one another. On your larger issue, the threshold legal question, the government points out in footnote 11 that federal programs, many federal programs require fees and offsets. So I'd love to hear whether you propose a limiting principle or would the logic of your position mean that any entity, the patent office, FERC, the courts with our PACER fees, would all those have to come to a stop unless there was express authorization for that collecting of fees? This is on the issue of whether... Yeah, the threshold first issue, the logic of your opinion, is there a limiting principle? Because I was just looking at Congressional Research Service in fiscal year 2017. The government collected over $300 billion of offset user fees. So if the logic of your position is there has to be express authorization any time money is collected, that contemplates a huge outcome. I'm not saying that the government has said that. They only dropped a footnote adverting to that. But I wonder what your thought was. I think any instance where the authorizing legislation limits the ability to collect to a particular fiscal year, I think that would be the right result. And not all situations need that. For example, there are some instances where the authorization isn't limited to a particular fiscal year and it continues from year to year without further. But that's not what the Congress did in this instance. And I'm sure it's not what they did in other instances too. But yes, I do think that if there's a specific authorization, as in this case, where the Consolidated Appropriations Bill said you have the authority to assess and collect these fees in fiscal year 2017, and I'm sorry, in 2016, and then it's not reenacted in 2017 timely, which is the case here, the Continuing Authorization Bill that the agencies attempt to rely on don't say you have the right to collect those fees, impose those fees, and collect those fees in the fiscal year they're seeking to collect. And in that instance, I think that's a fatal deficiency. I don't think that you can say, well, I have authority because you authorized me to collect it in the prior year. What if they point to the—I mean, of course they do point to the Authority in Conditions Clause. And why is it not true that a condition of the funding for this inspection to prevent more BP oil disasters is that the industry will pay for it? Why isn't that a condition of the funding stream, is that we're going to get an offset? Well, it might be, but I think they have to authorize it for the specific year in which they're assessed and domain. But Section 101 says conditions continue. And I'm saying this looks like a condition. I just—I don't agree with that assessment, but I understand the conditions. Okay, you don't agree when the government says we're going to fund this program, say PACER fees. Of course, you can collect your PACER fees on the condition that you make sure users pay for it. Why isn't that just a condition? Well, in that instance, I don't think it's limited as to when you can collect them. And I think in the instance of the authorization that we're dealing with for these fees, it said you have the right to collect them in fiscal year 2016. And then when they finally got around to passing the Consolidated Appropriations Bill for 2017, which was well into that fiscal year, it did, in fact, authorize the assessment and collection of those fees in 2017. The same thing happened in 2018. But in the interim, while there wasn't that authority, that's when these inspection fees were assessed and demands were made at a time when they didn't have authority. So then the question became, well, when the subsequent appropriations bills were enacted, does that mean they're retroactively effective? And we argued, and the original decision by the Interior Board of Land Appeals concluded that the Supreme Court disfavors retroactivity. So unless there was specific language that said those bills were retroactively applicable, they're not. So that's our position here, that they're not. Was this inspection program put in place as a result of the BP oil spill? In other words, has the industry been paying every single year since then? I've seen authority to that effect. I don't think they – I think – let's see. The first time that inspection fees were provided for in a congressional appropriations bill was in 2010, and then the regulations followed up in 2011, and they began collecting in 2011. Thank you. So if I can return a moment to the question of the second issue, which is how the installations were treated. It seems irreconcilable to me that when the regulation says in the first instance that the default provision, any group of OCS installations interconnected with walkways, but then – or any group of installations that includes a central or primary installation with processing equipment and one or more satellite or secondary installations as a single facility. That's a direct – is a single facility, not maybe a single facility. But then it does give the regional supervisor the discretion to decide the complexity of the individual installations, whether it justifies their classification as a separate facility. I think Your Honor, you recognize the issue, as I see it, that it's not the complexity of the inspection. It should be the complexity of the facility. And I'll just give you a couple examples. So as we discussed previously, the one connected by a walkway, essentially identical to all others, it's treated as part of the primary facility or assessed as one facility with the two connecting platforms. If you have that identical single well case on 25 feet away on the other side, I can see it visually from the platform, but it's not connected by a walkway. A misassociated declaration makes clear that the agency would treat that separate, unconnected case on as a separate facility. Where does he make that clear? I mean, I see where he says walkways are – seem to be sufficient. And I seem to see – and he says where there are subsea tiebacks and no walkways, but at some distance, then that's multiple facilities. But I don't see anything about the 25 feet. Oh, he doesn't say specifically about 25 feet. I thought you said that he made clear that if it was 25 feet away with no walkway, that that would be a separate facility. Well, at least – excuse me. At least the way I read his paragraphs out, and I'll cite to that, where secondary or satellite installations are attached to the primary facility via subsea tiebacks, but installations rise above the waterline some distance, and that's where the some distance comes from, but he doesn't say what distance. From the primary facility without a walkway, that's when they're treated as a separate facility. But what in the regulation would prevent him or someone else at the department from saying, we think it's complex when the subsea tiebacks with no walkways span somewhere between a quarter mile and a mile? I mean, I take that to be what paragraph 7 says, and I'm not sure I see in the regulation where that would be prohibited to them. Because I think in all instances, having a policy that says that's what we're going to do renders that provision completely meaningless and ineffective. Is there anything else in the record beyond this declaration that suggests that they are – that they've effectively turned the walkways into the sine qua non, right? That is, with a walkway, it's singular, without the walkway, it's multiple? Yeah, what I would point to is the fact that they treated the one that is likewise tied back to a subsea connection, but yet is also connected by a walkway. They treated that as a single facility. Are there any regulations dealing with walkways and interference with navigation? I mean, I can see why a mile-long walkway on open water might be a problem. Do we have anything like that? I can't say I'm specifically aware of any, but, you know, both as a practical matter and as a navigation hazard, I'd be surprised if there aren't. I see I'm out of time, so unless the Board has further questions, I'll reserve the remainder for rebuttal. Thank you. Good afternoon. My name is John Adams. On behalf of the federal government, I may please the Court. This appeal arises from inspection fees used to support safety in offshore drilling on least federal lands to prevent another BP, oil spill, or deep water that could arise in a disaster. These inspection fees are authorized under the Outer Continental Shelf Lands Act, Annual Consolidated Appropriations Act, Continuing Resolutions, and the Department of Interior's own regulations. For two reasons, the district won't correctly grant the federal government's summary judgment on the fees' legality. First, in contrary to my co-sponsor's unprecedented argument, which I understand now has no limiting principle and could affect hundreds of billions of dollars or even over a trillion dollars of collected fees from the federal government and its appropriations team, the department had statutory authority to levy inspection fees at issue here. Well, I mentioned that, but you relegated that to a footnote with just two citations, so do you, I mean, you didn't seem to be too concerned about it in the brief. Well, Your Honor, they emphasized that particular argument, but it's an unprecedented argument to contend that the federal government can't collect inspection fees right here. We weren't able to find any precedent. Medco was not able to find any precedent. But there is a difference between funding and collecting. It could easily be that you would have to have express authorization for the government to take money, as distinct from spend money. That's sort of the logic. Admittedly, neither side's given as much case law. Let me turn that into a question. When you look at Section 101, you're saying the authority to collect user fees comes, is it from the conditions, or is it from authority, or is it because the same amounts language wouldn't be the same amounts but for the industry paying? In other words, I was looking at the language and saw three different ways. I want to know what the government says is the best of the three. Both, Your Honor. I know, both is always the answer. But rigorously looking at the language, what's going on here? Are these conditions of funding?  And let me begin with the text and plain meaning of Section 101 of the 2017 and 2018 continuing resolutions, which are identical. First, Section 101, as Your Honor pointed out, appropriates money for, quote, such amounts under the authority and conditions, end quote, provided under the Consolidated Appropriations Act. Let me begin with authority. Quote, the Consolidated Appropriations Act provides authority, indeed mandates that the department collect the inspection fees, and that's found in Section 107 of the Consolidated Appropriations Act, which speaks in mandatory language, and I'll just quote it. Section 107 states, quote, in fiscal year 2017, the Secretary shall collect a non-refundable inspection fee, end quote. And then, Your Honor, turning to conditions, you're exactly right, that the fees are a condition of the appropriation, and I will refer the Court to 131, Staff 135 and 446, and I'm just going to read the whole language to show that this is a condition. Quote, for the additional amount, and this is in 2017, the only difference is the appropriated amount. Quote, for the additional amount of $53 million to remain available until expended to be reduced by amounts collected by the Secretary and credited to this appropriation, which shall be derived from non-refundable inspection fees, end quote. That is the condition, Your Honor. And then let me move on to the other clause under Section 101 that also supports the government, and that's projects or activities. Section 101 states that appropriations for money, quote, for such amounts as may be necessary for continuing projects or activities, end quote. As the District Court found, and as the government explains in its brief, the inspection fee program is a project or activity under the continuing resolution. What of the retroactivity problem? Yes, Your Honor. Medco contends that there is no retroactive effect to the Consolidated Appropriations Act. That is wrong. The Consolidated Appropriations Act that was passed subsequent to the continuing resolutions mandates that the Department of Interior levy these inspection fees for the whole entire fiscal year. And moreover, Your Honor, as we explain in our brief on pages 35 and 36, when we cite the Gonzales case from the Supreme Court, there's no retroactivity issues here. The court goes to things such as the impairment of rights, increase of liability for past conduct, or imposition of new duties to identify a retroactivity problem. And none of those conditions are here. As I think Your Honor pointed out earlier, appropriations has been happening ever since 2010, every single year, and it wasn't until seven years later that Medco challenged this inspection fee program. Well, I take it the challenge is based on the idea that there was a lapse in the statutory authority for this period of this $323,000 in the fees. And so I guess the question is when Congress comes back and they issue the continuing resolutions, say continue doing what you did in 16 and 17, why would that necessarily mean continuing levying the fees as opposed to just saying, because the way I read the original appropriation in 2016 is it says, look, you get $65 million, right, unless you collect more and then there's a provision, a proviso in fees. But you're going to get $65 million. That's either going to come from the FISC or it's going to come from regulated industry. But either way, you're going to get $65 million. So that part obviously continues forward. That's the thing when it says other amounts. The question is where do you get the power to go after the regulated industry to say contribute to the pot? Well, in the continuing resolution argument, it's just a colloquy that I had with your colleague about amounts and conditions and projects or activities. So the condition, you know as well as I do, probably know better than I do. Conditions on appropriations often look different, right? It says you are hereby appropriated $65 million provided that you use $20 million for this and $20 million for that and $25 million for the third thing. Those are the conditions on appropriations. That's what so many of our friends in Washington get paid such big bucks to fight about in the general appropriations process. And that I understand. It strikes me you're on more solid ground with authority, right, which is the way I understand that this pot works is you have the authority to either get the $65 million from the Treasury or to get some portion of the $65 million up to $65 million from the regulated industry. And that's the thing that you say gets carried forward. Yes, sir. I think it's four things. It's authority, conditions, projects, or activities all within the continuing resolution itself. And that's just the continuing resolution. And then you can go to the Consolidated Appropriations Act, which talks about mandating the non-refundable inspection fee program for the entire fiscal year. And I would also emphasize that the whole purpose of a continuing resolution is to maintain the status quo. And that's something that both parties agree with here. And I'll quote from MEDCO's opening brief. MEDCO does not disagree that the overall purpose of the continuing act for continuing resolutions was to maintain the status quo of authorized government funding operations, end quote. And that's found on page 26 of the opening brief. Maintaining the status quo here is maintaining the non-refundable inspection fee program that's carried over from the prior fiscal year. Can we talk about walkways? Yes, I'm excited. So help me understand the provenance of this declaration and this is proffered by the government as a way to explain what exactly? What is your reliance on this? And how do we pronounce the surname, I guess? We should probably get that clear to you. Saucier? Saucier? I'd say Saucer. Saucer, whatever. Let's do it. Help me understand what it's supposed to say. I see the sub-C type X. I see the footnote. I understand there's some different distance. But I don't really understand how it comports with the regulation. Well, let me first reference the regulatory language that is at issue here, which in this case turns on and then I'll get to the declaration. Section 250.105 states, the regional supervisor may decide that the complexity of individual installations, and in their honor it's plural, it's not singular, complexity of individual installations justifies their classification at separate facilities. So pursuant to that provision within the regulation, the declaration was offered as a way to affirm that the complexity of the installations here satisfies them, including that these are separate facilities, that there are 19 separate facilities in the main path system. Strictly speaking, when you read it, it's very minimalist in paragraph 7. And it doesn't specifically say, here's what's complex about the various caissons, distance or whatever, engineering standpoint. It does seem to suggest he was thinking, we've got to get in a boat and go to each one. Well, that's one consideration, your honor. I think there were a few considerations. And it ultimately came to the conclusion about time and resource intense inspections to be able to go through. But at the bottom, it's about the arrangement of MEDCO's caissons, the 21 facilities at issue here, that made it difficult for BSEE to be able to inspect, to conduct the inspections. And that's what justified the conclusion that these are actually separate facilities going through, 19 separate facilities. Is there sub-regulatory guidance from the department, from BSEE, sorry, about this last sentence in 250.105? The regional supervisor may decide the complexity of the individual installations justifies their classification as separate facilities. Is there some document that says, here are the factors we think about. 1,500 feet is too much. 6,000 feet is, I'm sorry, is too little. 6,000 feet is too much. We care about walkways. This is really about inspections. Is there really anything that we can put our fingers on to understand how you get from 250.105 to paragraph 7 of the declaration? I'm not familiar with any, your honor. There's none in the record to my knowledge. That's not something that my co-briefs. But as your honor is alluding to, the regulation itself affords a lot of discretion for the Department of Interior to make these types of assessments. And this is actually, your honor, analyzed under the Arbitrary and Capricious Review under Section 706 of the Administrative Procedure Act. Setting aside arbitrary and capricious, which is highly deferential, as this court knows, going to the complexity. What does it mean to be complex? As we explained in our brief, it's an ambiguous provision. And the Department of Interior's application of it should be titled for deference. Well, as you know, there is an increasing amount of skepticism, both in this court and in the one in Washington, D.C., over the idea that an agency can write a capacious regulation and then come into federal court and say, well, turns out, you know, we wrote it to give ourselves a ton of leeway. And man, did we use it today. So that is increasingly problematic. And I'm not exactly sure how, like, I get it, that it's capacious. It just says you may do it. It doesn't have any standards whatsoever. But then to turn around and say, because we gave ourselves no standards, we have to win, is a bit problematic. Yes? There is a standard on arbitrary and capriciousness. And take the point about skepticism. And if you're referring to local right, I just want to emphasize that Kaiser remains good law. And Kaiser applies here. And Kaiser directs this court to defer to the agency's interpretation of its own regulations. Here in the interpretation here is deference. If we didn't have the Saucier Declaration, so we just had that aerial photo that showed 18, whatever number of them, spread over five miles, would that be sufficient? Well, there would have to be an application of it, right? There could be post hoc rationalization. No, I know. But what does Saucier add other than, you know, I'm not making light of it. Of course, it's very important for the inspectors to keep moving on and do as many as possible. But it's sort of a version of the same point. If complexity, why wouldn't your arguments here be, oh, complexity is shown by the photo of MP64? Because it's complex. It's not walkways. It's underwater. That sure looks complex. Would that be enough? Your Honor, if there was a factual finding by the department, yes, it would be enough. And to point to the declaration, I think paragraph 7 is a very important paragraph to your question, Your Honor. But does he ever say installations, plural? Does he ever say what's complex? Because these caissons look, you know, pretty minimalist. I'm sure they're really important. Yes, he does say installations. That's in paragraph 7 of his declaration. And it's the configuration, the arrangement, what looks like a constellation in the map on our response brief on page 9 that makes it complex. And it's even more than that, Your Honor. What makes it complex? I missed that piece. I didn't understand what you just said. Oh, well, I'm getting there. In paragraph 7, there's a footnote in the declaration that just talks about the distance between the caissons and what it means, the time and resources that it takes the department to be able to inspect all those different caissons, anywhere from 1,500 feet to over a mile. And even Medco concedes that distance is a relevant factor to determine. Does the record answer the question I asked him, which is do they have to physically inspect each caisson? Is that stated in the record? I'm not aware, Your Honor. Medco has not brought that in its papers. But is the position, does it logically have to be any one of these tentacle-like offshore rigs where there isn't a walkway? It is complex, even though it's one installation. No, Your Honor, I didn't want to emphasize it was a case-specific requirement. But what did he say other than there is no walkway? What else did he say? Well, I will quote him. In this case, the 18 satellite facilities are located between 1,532 feet, more than a quarter mile, and 5,988 feet, more than a mile from the primary facility. So it's just distance? That's one consideration, Your Honor. What are the others? There's only one in the footnote. Walkways are a consideration, too. Distance, and then the configuration and the arrangement of the particular facility. What if the most distal caisson was at 5,000 feet? I'm sorry, Your Honor? What if the most distal, that is the furthest away, caisson was 5,000, not 5,988? What if it was 5,000? Would that be a single installation? I would think so, Your Honor. It would? If I understand your question, if one caisson, the most distant one, was nearly a mile or over a mile? It would be 5,000, not 5,988. The regional supervisor has discretion pursuant to the regulations to make that determination. What if it was 4,000? Your Honor, I would just emphasize that this is a case-specific analysis of all the different configurations of the various caissons. So yes, to answer your question, yes, that could be. We could see going all the way down. At some point, the court would consider whether the regional supervisor is acting arbitrarily or capricious. And this isn't a case where all the caissons are within a 50-foot radius of each other. The caissons themselves are over 20 miles. But you may already sense the tension in the conversation that we're having, because the questions that I'm asking are about line drawing, and the answers that you're giving are about the discretion of Bessie and the regional supervisor. All of the things that you're telling us make perfect sense if the standard of review is committed to agency discretion by law, which is a thing that the APA counts as. All of the things that you're saying make less sense and are less persuasive if we have to review for arbitrary and capricious review, because the entire premise of A and C review is that we have to have some standard. We have to have some ability to say, yes, you're treating like things alike. Yes, you're applying a standard even-handedly. Yes, you came up with a rational justification for dividing between 5,000, 4,000, and 1,500. And I'm asking you for the line, but what I'm getting back is, hey, broad discretion. Look at the text. Well, you're right on, both under arbitrary capriciousness and under the discretion. In arbitrary capriciousness, the standard that this court has employed, as courts across the country have employed, is whether there's a reasonable relationship between the facts found and the conclusion made. In this particular case, taking a look at the distance between and among the K signs in the polar region of the configuration that Bessie has to respect, that is a reasonable factual finding to make the conclusion that these are separate facilities that Bessie has to respect and ensure the safety. Let me ask you the same question. Is there any kind of regulation dealing with walkways out there? I'm not familiar with one, Your Honor. My code doesn't cite one. There's nothing cited in our papers about it. One other question. Do they look below the waterline, and if so, how far? Did Bessie and the inspectors look below the waterline? My understanding is that the inspections do integrity testing for both the case on the structure itself and the wells. And so, Your Honor, if you're getting to the integrity testing, my understanding is, yes, they do go below the waterline for those types of tests. So, a large part of the inspection has nothing to do with just looking at the tip of the caisson, how long it takes them to get out there. You still have to do substantial testing below the waterline. That is my understanding, yes, Your Honor. At each caisson? Yes, Your Honor, that is my understanding. In closing, if this Court has no further questions, the governance would ask that the Court affirm the order for the disreport.  Is there anything in the record about how other facilities are treated with similar situations with walkways? The direct answer is there's not. We did try to introduce some evidence after the IVLA ruling, when the agency didn't issue, when that ruling was vacated or retracted, dissolved, I guess, and didn't issue another ruling. We then attempted to put some evidence in the record. The District Court did not allow it because we said it wasn't part of the administrative record. It's a bit of a catch-22 because if the IVLA had issued another decision, we would have had the opportunity to do that. Do you have any reason to disagree with his last statement factually? Yes, because this particular regulation that addresses the inspection fees only applies to installations that protrude above the water. So if it were just a subsea tieback that didn't have an installation that protrudes above the water, this particular inspection wouldn't come into play at all. But he's saying when they're checking the protrusion, there's an integrity test that goes down under the water. No, there's just no evidence in the record that that's the case. And I disagree with the contention that Council made that the decision to classify these installations as separate facilities was done on a case-by-case basis. I don't think that's a fair reading of paragraph 7 of Mr. Saucier's declaration because he says in that paragraph that when they're not connected by walkways and they're some distance away, Bessie considers the secondary or satellite structures to be separate facilities because the installation arrangement results in more complex and time- and resource-intensive inspections. And there's no details at all around that, what the inspection entails, how much longer it takes, etc. But in the next paragraph, he says in determining the number of MEDCO facilities in Maine Pass 64 Lease Block, pursuant to this long-standing practice, and I can only interpret that as referring to the practice that he describes in paragraph 7, which isn't specific to the MEDCO facilities. I read that to be golf-wide. So as an example, there's a Thunder Horse production facility located about 150 miles out in the Gulf of Mexico, and most of the wells are subsea tiebacks without facilities that protrude above the water. But just the mere fact of getting to that location, 150 miles out, by boat or by helicopter, is going to entail, I would say, certainly more time than what it would take to get to the Maine Pass 64 facility, which is about eight miles offshore, or to go to all of the one-mile radius where these installations are located. So I don't think that holds up. And certainly as a blanket policy, if it reads out of the regulations, all situations where there are connecting walkways, and that's a definitive factor, I think it just improperly negates a material portion of the regulation, and I don't think under that circumstance, Kaiser deference is applicable. I think you have to look at the plain language of the regulation and use the tools of interpretation that you would under those circumstances. Thank you. Thank you very much. Thank you, Councillor.